IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON STEPHEN SIGUR,<br><br>     Petitioner,<br><br>  vs.<br><br>RAYTHEL FISHER, Warden, Valley State Prison,[1]<br><br>     Respondent. | No. 2:17-cv-00663-JKS<br><br>MEMORANDUM DECISION |

Jason Stephen Sigur, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Sigur is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Valley State Prison. Respondent has answered, and Sigur has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On March 15, 2012, Sigur was charged with 11 counts of contacting or communicating with a minor, kidnapping for purpose of lewd act on a child, 9 counts of first-degree burglary, 20 counts of lewd and lascivious acts upon a child under fourteen, and failure to register as a transient offender. The information further alleged various enhancement allegations. Sigur entered not guilty pleas, denied the allegations, and proceeded to a jury trial. On direct appeal of his conviction, the California Court of Appeal recounted the following facts underlying the charges against Sigur and the evidence presented at trial:

> A.B. testified that she was born in June 1997. A.B.'s parents, D.B. (mother) and C.B. (father), were divorced and A.B. alternated every other week between her mother's

---

[1] Raythel Fisher, Warden, Valley State Prison, is substituted for J. Martinez, former Warden, Sierra Conservation Center. FED. R. CIV. P. 25(c).

and father's homes.  At the time of her contacts with [Sigur], A.B. had a cell phone with Internet access and had access to a home computer at her mother's home.  When she stayed at her father's home, she was not allowed to use her cell phone except to call her mother, and she did not have access to a computer there.  When A.B. stayed at her mother's home, she occupied the front bedroom, her grandmother occupied the rear bedroom, and mother slept on the sofa in the living room.

A.B. testified that in late 2009, when she was 12 years old, she began visiting an online chat room on the airG Web site.  Because airG required users to be at least 14 to create a profile and chat, A.B. created a profile listing her age as 14.  She would visit the "singles" and "20's" chat rooms to chat with others online every day.  Her parents were unaware of her participation in these chat rooms.

In late August 2010, when A.B. was 13, she met [Sigur] in a chat room when she asked whether anyone in the 916 or 530 area codes was in the chat room and [Sigur] responded.  A.B. viewed [Sigur's] profile, which indicated he was in his 20's.  A.B. and [Sigur] began chatting privately, and A.B. then gave [Sigur] her cell phone number.  [Sigur] sent A.B. a text message and they communicated by text messages for about 90 minutes.  During this initial conversation, A.B. revealed that she was actually 13 and [Sigur] revealed that he was actually 35, and the two agreed to meet in person.  A.B. asked [Sigur] to visit her, and later that same day, [Sigur] met A.B. outside her mother's home.  He arrived in a purple Ford Ranger pickup.  Thereafter, [Sigur] and A.B. took a 20-minute walk together.  They agreed that if they ran into someone who questioned their age difference, they would say [Sigur] was A.B.'s uncle.

A.B. testified that she and [Sigur] continued to communicate via text messages daily, and [Sigur] came to visit her at her mother's house several days later.  They walked to a more secluded area where [Sigur] and A.B. kissed for a while and at [Sigur's] request, A.B. orally copulated him.  During this visit, [Sigur] told A.B. that he wanted to have sex with her.  A.B. was a virgin at that time and she told him she was worried that it was not the right time for her and that her mother would find out.  She also told him that she was worried he would leave her afterward, and [Sigur] reassured her and told her that he loved her.  A.B. then went to stay at her father's house for a week, but she and [Sigur] continued to send each other text messages when she was able to use her cell phone.  They discussed their feelings for each other and agreed to become a couple.

When A.B. returned to her mother's home the following week, she and [Sigur] arranged to meet a third time.  [Sigur] asked if he could come visit A.B. at her mother's house, and she said yes.  This time, [Sigur] came to her bedroom window at night.  [Sigur] pulled off the window screen and A.B. sat on the window sill.  A.B. testified that she and [Sigur] kissed and [Sigur] touched her breast and vagina.  [Sigur] again told A.B. that he wanted to have sex with her and she felt somewhat pressured but said she was not ready.  [Sigur] was outside A.B.'s window for several hours and then came inside her room to say good night.  A.B. promised him that she would have sex with him the next time he visited her.

A.B. again went to her father's house for a week, and she and [Sigur] continued to send each other text messages and spoke over the phone.  She told [Sigur] she would "keep [her] promise."  A.B. testified that she felt like she had to keep her promise to have

sex with [Sigur] because she did not know him very well and "for a while [she] was scared that he was going to try to hurt [her] or pull a weapon on [her]."  The next week when A.B. returned to stay with her mother, [Sigur] and A.B. planned for him to come over for the fourth time, again at night while A.B.'s mother was sleeping.  A.B. testified that when [Sigur] arrived, she "just told him to come in" and [Sigur] climbed through A.B.'s bedroom window.  [Sigur] kissed and fondled A.B. and removed her clothing.  A.B. orally copulated him and then [Sigur] had vaginal intercourse with her.  After this fourth visit, [Sigur] made five or six similar visits to A.B. between September and October 15, 2010, and they had vaginal intercourse and she performed oral sex on [Sigur] each time.

At some point during this time period, A.B.'s father, found messages from [Sigur] on A.B.'s cell phone and confronted her about them.  A.B. told her parents that [Sigur] was a 14-year-old boy who skateboarded in the neighborhood.  After that, A.B. was not allowed to bring her cell phone to her father's home and her mother would confiscate the phone at night while A.B. was staying at her mother's home.

Father testified he had a phone conversation with a person who identified himself as Jason[FN2] and sounded like an adult.  Father asked Jason if he knew A.B. was a minor, and the man said A.B. told him she was 18.  Father told him not to call back because she was only 13.  He also told the man he would involve the sheriff's office if the man contacted A.B. again.  Father told A.B. he did not appreciate her talking to an adult and not to contact him again.  Father took A.B.'s phone from her.

> FN2.   Father initially recalled that he interrupted a phone conversation A.B. was having, took the phone from her and spoke to Jason at that time.  Later, he acknowledged he had told a deputy sheriff he had seen inappropriate text messages and called the number associated with those messages.  Ultimately, he said he was not sure who initiated the call.

A.B. testified that on October 14, 2010, she was supposed to return to stay with her father, but she told [Sigur] that she did not want to go there and wanted to stay with [Sigur] instead.  [Sigur] had previously told A.B. that he wanted her to come live with him.  [Sigur] agreed to take A.B. that night to stay with him.  When [Sigur] arrived, A.B. again opened her window to let [Sigur] come into her room.  A.B. packed her clothing and possessions, and [Sigur] brought her a bag to carry them and helped her pack.  A.B. did not pack her cell phone because her mother had it in the living room.  She left with [Sigur] through the window around midnight, and they replaced the window screen.  [Sigur] drove a white Yukon, which he said he borrowed because his pickup was out of gas.  They planned to tell others that A.B.'s father could no longer take care of her and [Sigur] was a friend of her father's.  They stopped at Walmart for various sundries for A.B. on the way to [Sigur's] home, which was in a trailer park in Woodland.  When they arrived at [Sigur's] trailer, [Sigur] and A.B. had vaginal intercourse.  [Sigur] then returned the Yukon, which he had borrowed from his estranged wife.  Afterward, they returned to the trailer and had vaginal intercourse a second time.

3

A.B. testified that the next morning, October 15, she and [Sigur] woke up early and went for a walk, during which A.B. met [Sigur's] former roommate, Brandon K. A.B. testified that [Sigur] received two or three phone calls, and A.B. saw that one of them was her mother calling from A.B.'s cell phone. [Sigur] then went to school, leaving A.B. alone in his trailer.

Mother testified that when she discovered A.B. was missing on the morning of October 15, she called 911 and called father. Suspecting that A.B. was with [Sigur], who she thought to be a 14 year old in the neighborhood, Mother then called his number from A.B.'s phone and left a message that she was looking for A.B. After a deputy sheriff arrived at Mother's home in response to her 911 call, Mother checked the household computer and found a conversation with [Sigur] on A.B.'s instant messenger account, which she provided to the deputy.

Deputy Laura Bradshaw testified that after interviewing father and mother and obtaining [Sigur's] cell phone number, she received authorization to ping the cell phone and found its location in Dunnigan. She then contacted the Yolo County Sheriff's Office and requested a welfare check at that address. Deputies Roman Keister and Matthew Davis conducted the welfare check and spoke with a woman who informed them that [Sigur] was her stepmother's husband but no longer lived there. She told the deputies that [Sigur] lived at a nearby trailer park and drove a purple truck. The deputies went to the trailer park and found a purple Ford Ranger with a license plate registered in [Sigur's] name parked next to a trailer. Deputy Keister testified that A.B. responded to their knock on the trailer door. She asked Deputy Keister if her parents were with him. He explained that they were not, but that they were worried about her. She told the deputies that she did not want to be there and she was afraid that she would never see her parents again. Deputy Keister testified that A.B. then hugged and thanked him.

A.B. was taken to the sheriff's department where she was interviewed by two detectives. A.B. initially lied to the first detective, Detective Dean Nyland, about having sex with [Sigur] because she was afraid of getting in trouble and felt awkward talking about it. Detective Nyland testified that he thought A.B. would be more comfortable talking to a female detective, and Detective Jennifer Davis took over the interview. A.B. then told Detective Davis the full story and admitted that she had a sexual relationship with [Sigur].

Thereafter, A.B. was taken to a hospital where she underwent a forensic sexual assault examination. Dr. Angela Rosas testified that she collected swabs of semen from A.B.'s vagina and underwear. It was later determined that the DNA from these swabs matched [Sigur]. Additionally, DNA from semen found on A.B.'s mattress cover in her room at mother's home matched [Sigur].

[Sigur's] former roommate, Brandon K., testified that [Sigur] asked him to move out of the trailer because his girlfriend was moving in with him. Additionally, Brandon K. testified that [Sigur] had talked about A.B. by her first name and bragged about having sex with her. He testified that on the morning of October 15, [Sigur] introduced him to A.B. as his girlfriend.

The prosecution presented additional evidence, including a receipt from Walmart and security video footage showing [Sigur] and A.B. at the cash register at 1:36 a.m. on

4

October 15, 2010.  Further, there were cell phone records of numerous calls and text messages between [Sigur] and A.B.

While being transported to the sheriff's office after his arrest, [Sigur] asked why he had been arrested and Deputy Keister told him that he was wanted for questioning about a missing girl found in his trailer.  [Sigur] replied, "What girl[?]  When I left this morning no one was in my trailer."

[Sigur] was later interviewed by Detective Nyland.  Initially, he said he only met in person two women he had first met in chat rooms, but denied meeting anyone else from a chat room in person.  He denied knowing anyone in El Dorado Hills and denied even knowing where El Dorado Hills was located or how to get there.  He admitted receiving a voice-mail from mother, but said the call came from a phone number he did not recognize.  In the voice-mail, mother said something about her daughter being missing, but [Sigur] said he had no idea who mother was.  He denied ever hearing the name A.B. or meeting anyone with A.B.'s first name in a chat room.  He denied picking A.B. up at her house and taking her to his trailer.  He said he did not know A.B. and claimed he never met A.B.

Early in the interview [Sigur] claimed he met a young female at his trailer park the day of his arrest who approached him and asked what it was like to live there.  He first said the girl appeared to be 15 or 16.  Later in the interview, when asked how he would explain his DNA inside the victim, he said the girl he met at the trailer park that day had flirted with him and followed him into his trailer.  He said nothing happened between the two of them and that when he left his trailer, there was nobody there.  Later, he said the girl indentified herself by her first name (A.) and that he had actually met her in a chat room in June.  [Sigur] claimed she told him she had just turned 18.  He claimed that she came on to him and he had vaginal intercourse with her in his trailer.  Thereafter, at her request, they walked around the trailer park together.  [Sigur] denied ever going to the girl's house, but said they had texted each other daily since they met in the chat room.  He said multiple times that he did not know how the girl got to his trailer park and that day had been the first time he physically met the girl.  He said he did not know in advance that she was coming.  On multiple occasions during the interview, he denied picking her up at her house.  He also denied entering the house through the girl's window and said the last time he had climbed through a window was when he was 17.  Multiple times during the interview, he denied ever going to the girl's house.  And he denied being with the girl in Walmart earlier that morning.  In contrast to his earlier statement that the girl was around 15 or 16, at this point in the interview he claimed the girl seemed at least 18 to him.

While [Sigur] was in custody at the jail, he asked a volunteer to send a message to A.B.'s e-mail on his behalf.  The message said, "[H]e still loves you and asks that you please write him."

[Sigur] did not present any testimony in his defense.

*People v. Sigur*, 189 Cal. Rptr. 3d 460, 463-67 (Cal. Ct. App. 2015).

5

At the conclusion of trial, the jury found Sigur guilty on all counts and found true all sexual conduct enhancement allegations.  In a bifurcated proceeding, the trial court found true the strike allegations.  The trial court subsequently sentenced Sigur to an aggregate determinate term of 107 years' imprisonment plus an indeterminate term of 550 years to life imprisonment.

Through counsel, Sigur appealed his conviction, arguing that: 1) the prosecutor committed misconduct by misstating the definition of reasonable doubt; 2) the trial court erred in denying his § 1118.1[2] motion for judgment of acquittal as to the burglary counts; 3) the prosecutor misstated the law regarding the consent defense to burglary; 4) the cumulative effect of the above errors warranted reversal of his conviction; and 5) Section 288.3[3] is unconstitutionally vague; 6) Section 288.3 is unconstitutionally overbroad; and 7) the 15-year enhancement imposed pursuant to § 667.8(B)[4] must be stayed.  Respondent agreed that the 15-year enhancement must be stayed, but otherwise opposed the appeal.  The California Court of Appeal modified the § 667.8(B) enhancement but unanimously affirmed the conviction in all other respects in a reasoned, partially-published opinion issued on July 9, 2015.  *Sigur*, 189 Cal.

---

[2]     That section provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."  CAL. PENAL CODE § 1118.1.

[3]     That section provides: "Every person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit [a specified] offense . . . involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense."  CAL. PENAL CODE § 288.3(a).

[4]     That section provides for an additional term of nine years' imprisonment where a defendant used kidnapping to effect certain crimes.  CAL. PENAL CODE § 667.8(B).

Rptr. 3d at 474.  The California Supreme Court summarily denied Sigur's petition for review on

October 14, 2015.  Sigur then filed three *pro se* petitions for habeas relief in the state courts, all

of which were denied without comment.  Docket Nos. 9-17, 9-18, 9-19.

Sigur then filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on March 19,

2017, the timeliness of which Respondent does not contest.  Docket No. 1 ("Petition"); *see* 28

U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Sigur argues, as he did before the California

Court of Appeal on direct appeal, that: 1) the prosecutor committed misconduct by misstating the

definition of reasonable doubt; 2) the trial court erred in denying his motion for judgment of

acquittal as to the burglary counts; 3) Section 288.3 is unconstitutionally vague; and 4) Section

288.3 is unconstitutionally overbroad.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a

common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Sigur has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.    ***Prosecutorial Misconduct*** (Ground 1)

Sigur first argues that the prosecutor committed misconduct by misstating the law regarding reasonable doubt. In considering this claim on direct appeal, the California Court of Appeal laid out the following factual background:

> During closing argument, defense counsel argued the following: "[T]he thing about -- with reasonable doubt is that it has two separate components to it, and it is our

9

highest legal standard of proof, but also it is that it has to have an abiding conviction, meaning that the decisions you make as to this case ha[ve] to last over time.  Not just during the course of your deliberations, not just from a week or two from now, the decisions that you make in regards to this case have to last you for the rest of your lives.  That is how important these concepts are . . . . [¶]  And just as a hypothetical anyways is that you would be able to bring this whole concept of reasonable doubt to you [*sic*].  We used to be able to get up and be able to argue with you that the decision you make is as important as the decision that you make in who you choose to marry.  [¶]  You know what, we can't make that argument any more because what we know of some statistics is that most marriages, they end in five years.  So what that means is that you did not have an abiding conviction as to who you chose to marry, and to be able to sync this all home to you is that you might want to think about that, that the decisions that you make here in this courtroom during deliberations are even more important than who you choose to spend the rest of your life with.  [¶]  That is what it means to be able to review the evidence beyond a reasonable doubt."

The prosecutor responded to defense counsel's argument in rebuttal.  The following argument, objection, and ruling took place at that time:

"[THE PROSECUTOR]: I'm going to close with talking about reasonable doubt a little bit.  When I sit and I listen to [defense counsel] it sounds like, oh, my gosh, that is so such an unattainable standard, but it is not an unattainable standard.  Excuse me.  [¶]  Every juror -- jury across the nation uses the same standard and jurors return guilty verdicts every day.  The standard is the same in a DUI case as in a murder case, and DUI convictions come along every day.  Murder convictions come along every day.  It is not an unattainable standard.  It is -- and *it's not analogous to you deciding to get married.  I mean, those two things don't even -- aren't in the same ballpark, the same playing field.*  [¶]  Being convinced beyond a reasonable doubt just means you feel good about your decision.  You feel you're making the right decision, and you're going to feel that way tomorrow --" (Italics added.)

"[DEFENSE COUNSEL]: Objection --

"[THE PROSECUTOR]: -- and the next day.

"[DEFENSE COUNSEL]: -- misstatements.

"THE COURT: Overruled.

"[THE PROSECUTOR]: And you're going to feel that way the next day, and the next day.  You're not going to question yourself.  That's all it means.  [¶]  And in this case aren't you convinced, is there any doubt in your mind as you sit here right now that [Sigur] has been having sex with

[A.B.] since mid August?  Is there any doubt in your mind that he
kidnapped her on October 14th, and that he had sex with her two times on
October 15th.  [¶]  The evidence in this case is overwhelming, and as you
sit here today you should have no doubt in your mind of the truth of the
charges."

According to Sigur, the prosecutor misstated the law on reasonable doubt by "temporally

quantif[ying] 'abiding conviction' in terms of 'feel[ing] good' for a few days about the

decision."  Federal habeas review of prosecutorial misconduct claims is limited to the narrow

issue of whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477

U.S. 168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's

conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due

process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas

review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief

only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'"

*Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

Under clearly established federal law, a prosecutor's incorrect and improper comments

will be held to violate the Constitution only if they "so infected the trial with unfairness as to

make the resulting conviction a denial of due process."  *Parker v. Matthews*, 132 S. Ct. 2148,

2153 (2012) (per curiam) (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)); *see*

*Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000).  In determining whether the

prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the

context of the entire proceeding.  *Boyde*, 494 U.S. at 385; *Darden*, 477 U.S. at 179-182.  Even

when prosecutorial misconduct rises to the level of a due process violation, such misconduct

provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error

11

test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993).  *Shaw v. Terhune*, 380

F.3d 473, 478 (9th Cir. 2004).

Upon independent review of the challenged comments in light of these guidelines, the

Court concludes that the Court of Appeal's rejection of Sigur claims was neither contrary to, or

an unreasonable application of, clearly-established federal law.  As the appellate court explained:

> Contrary to [Sigur's] interpretation, the prosecutor's comments did not imply that
> the jury's "abiding conviction" only had to last a few days; the language "the next day,
> and the next day" implied perpetuity.  Much like defense counsel's remarks, the
> prosecutor's comments evoked the concept of permanence.
> The trial court did not err by overruling the defense objection to the prosecutor's
> argument.  There is not a reasonable likelihood the jury construed or applied the
> prosecutor's remarks in an objectionable fashion.  No reasonable juror would have
> understood the prosecutor's argument to mean that, contrary to the court's instructions,
> an "abiding conviction" merely required the jury to " 'feel[] good' for a few days about
> the decision."  The prosecutor's argument was neither deceptive nor reprehensible, and it
> did not constitute misconduct.

This determination is both reasonable and fully supported by the record.  Moreover, the

Court agrees with the Court of Appeal's alternate determination that, assuming the prosecutor's

comments about reasonable doubt were improper, "the remarks were not prejudice."  First, the

prosecutor's challenged comments were isolated rather than extensive.  *See Trillo v. Biter*, 769

F.3d 995, 1002 (9th Cir. 2014) (prosecutor's misstatement about reasonable doubt did not play a

prominent role in the trial when it "was a single statement during a closing argument that took

twenty pages of transcript after a long criminal trial").

Second, the trial court correctly instructed the jury on the reasonable doubt standard.  The

trial court also correctly instructed the jury that if the attorneys' comments on the law conflicted

with the trial court's instructions, then the jury must follow the instructions.  *See United States v.*

*Medina Casteneda*, 511 F.3d 1246, 1150 (9th Cir. 2008) ("In this case, neither party disputes that

the jury instructions properly defined the beyond a reasonable doubt standard.  'The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel.'") (quoting *United States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998)); *see also Mihajson v. McDowell*, 752 F. App'x 538, 539 (9th Cir. 2019) ("The trial court not only properly instructed the jury on the reasonable doubt standard, it also instructed the jury to follow the court's instructions if they conflicted with counsel's statements.").

Finally, as the Court of Appeal noted, "[t]he evidence against [Sigur]—including A.B.'s testimony, the circumstances of how and where she was found, the DNA evidence, the electronic communications between [Sigur] and A.B., and [Sigur's] false statements to the police—was overwhelming."  Given the weight of that evidence, it is unlikely that any misstatements of the law by the prosecutor affected the outcome of the trial.  *See Darden*, 477 U.S. at 196 (reasoning that overwhelming evidence of guilt "reduced the likelihood that the jury's decision was influenced by" the prosecutor's improper argument).  Sigur is therefore not entitled to relief on this ground.

**B.**     ***Erroneous Denial of Motion for Judgment of Acquittal*** (Ground 2)

Sigur next contends that the trial court erred in denying his motion for judgment of acquittal as to five of the burglary counts on the ground that A.B.'s testimony was insufficient to support a jury finding that he entered the mother's home on five of the charged occasions.  On direct appeal, Sigur argued that the trial court erred in ruling that an "'express invitation'" is required to establish a consent defense to burglary charges.  According to Sigur, the trial court should have granted the motion because there was substantial evidence that A.B. consented to Sigur's entry into her mother's home and did so with knowledge of his felonious intent.

13

In the published portion of its opinion, the Court of Appeal acknowledged that "there was undisputed evidence establishing that A.B. expressly invited [Sigur] into the home knowing his intent to engage in sexual activity with her." *Sigur*, 189 Cal. Rptr. 3d at 469. The appellate court nonetheless concluded that the consent defense is not applicable to Sigur's case:

> When the defendant does not have an unconditional possessory right to enter as an occupant of the premises, a defense of consent to enter the premises for the purposes of engaging in felonious sexual conduct with a minor requires one of the following: (1) the minor has a possessory interest in the premises coequal to the parent or other adult owner/occupant and expressly and clearly invited the defendant to enter so the defendant could engage in sexual conduct with the minor; (2) a parent or other adult who has a possessory interest in the premises expressly and clearly gave the defendant permission to enter for the purpose of engaging in sexual conduct with the minor; or (3) the minor expressly and clearly gave the defendant permission to enter for the purpose of engaging in sexual conduct with the minor, the minor had been given permission by the parent or other person with a possessory interest to allow entry for such purpose, and defendant knew that the minor had been given such permission. Here, there is no evidence to support a consent defense under any theory.
>
> There is no evidence that mother consented to [Sigur's] conduct. There is no evidence in the record that A.B., a 13-year-old minor living in her mother's home, had authority to invite an adult man into the home for the purpose of having unlawful sexual relations with her. Indeed, there is evidence in the record suggesting that both A.B. and [Sigur] knew that A.B. lacked authority to invite an adult male into her room. Every aspect of [Sigur's] encounters with A.B. was secretive and designed to prevent discovery by her mother. A.B. specifically testified that she "knew that it wasn't right for an adult and a minor to be together." She told [Sigur] that she was worried her mother would find out about their relationship. A.B. testified that this is why she and [Sigur] agreed to have [Sigur] sneak through her bedroom window late at night after mother was asleep.[FN7] Additionally, A.B. hid the identity of [Sigur] from mother by telling her that he was a 14 year old who skateboarded in the neighborhood. And [Sigur's] false statements to the police about not knowing who mother was and claiming he had never been to the house show that [Sigur] knew that he did not have permission from mother to enter her home to have sex with her daughter and that A.B. did not have mother's permission to allow him to enter for that purpose.

*Sigur*, 189 Cal. Rptr. 3d at 473-74 (footnote omitted).

Sigur fares no better on federal habeas review. The thrust of Sigur's argument is that A.B.'s actions were sufficient to raise a consent defense to the burglary charges at issue. But

that argument raises an issue governed solely by California law that is not cognizable on federal habeas review. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle*, 502 U.S. at 67-68 (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). A "state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting that a state appellate court's determination of state law is binding and must be given deference). This Court is bound by the appellate court's determination that the consent defense was unavailable to Sigur because he "invaded [the] mother's possessory interest in the home and the evidence did not show that A.B. had the authority to allow [Sigur] into the home to engage in felonious sexual relations with her." *See Sigur*, 189 Cal. Rptr. 3d at 474. Sigur's claim therefore also must fail on federal habeas review.

**C.** *Unconstitutionality of § 288.3* (Grounds 3, 4)

Finally, Sigur argues that California Penal Code § 288.3(a), which provides criminal penalties for "[e]very person who *contacts or communicates with* a minor, . . . who knows or reasonably should know that the person is a minor, *with intent to commit an offense* specified in [§ 288.2] . . . involving the minor . . . ." is unconstitutionally vague and restrictive of free speech. Cal. Penal Code § 288.3(a) (emphasis added). The record reflects that Sigur filed a pre-trial

motion to dismiss the § 288.3 charges on the ground that the section is unconstitutionally vague because it does not define the terms "contact" or "communicate." The trial court denied the motion, reasoning that the section "is clear, it does not punish speech, and one would reasonably know that it punishes the act of communicating with a minor intending to commit one of several specified sex offenses." Sigur then filed another motion to dismiss the charges, again contending that the statute is unconstitutionally vague and also claiming that it violates the First Amendment guarantees of free association and free speech. The court likewise denied that motion, upholding the constitutionality of the statute. The Court of Appeal affirmed the determination on direct appeal, rejecting Sigur's claims for the same reasons the appellate court in *People v. Keister*, 129 Cal. Rptr. 3d 566 (Cal. Ct. App. 2011), gave for finding the exact arguments meritless.

The *Keister* court held that § 288.3(a) was not void for vagueness, reasoning that:

> The statute requires the defendant to contact or communicate with a minor or attempt to do so with the specific intent to commit an enumerated sex offense. (288.3, subd. (a).) Those are questions of fact. Whether a defendant made the contact or communication and had the requisite intent are yes-or-no determinations, not subjective judgments. "To be sure, it may be difficult in some cases to determine whether these clear requirements have been met. 'But courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" (*United States v. Williams*, *supra*, 553 U.S. at p. 306, 128 S.Ct. at p. 1846, 170 L.Ed.2d at p. 671.)

*Keister*, 129 Cal. Rptr. 3d at 571.

Similarly, the *Keister* court reasonably rejected a § 288.3 challenge on free speech ground as follows:

> While there is a limit on free speech to the extent that section 288.3 criminalizes otherwise protected communications with a minor, the statute has been written in a way that does not unconstitutionally restrict protected speech. Before the statute is violated, the defendant must know or reasonably should have known the other person was a minor, have the specific intent to commit an enumerated sex offense, and then contact or

16

communicate with that minor or attempt to do so. (§ 288.3, subd. (a).) Thus, without the unlawful sexual intent, the statute is not violated.

*Id.* at 572.

Again, this Court is bound by the California courts' reasonable interpretation of California law, which is well-supported by the record. *See Bradshaw*, 546 U.S. at 76 (citation omitted); *Estelle*, 502 U.S. at 67-68. Sigur points to no clearly-established authority of the U.S. Supreme Court contrary to the reasoning of *Keister*, and this Court is not aware of any. In the absence of any clearly established federal law on this issue, AEDPA relief is foreclosed. *See Carey*, 549 U.S. at 77. The Court of Appeal's decision with regards to vagueness and overbreadth thus did not involve an objectively unreasonable application of the governing clearly established Supreme Court authority, and Sigur is not entitled to relief on this ground.

V. CONCLUSION AND ORDER

Sigur is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 21, 2021.

    /s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

18